Andrew Rozynski, Esq.
EISENBERG & BAUM, LLP
24 Union Square East, Penthouse
New York, NY 10003
212-353-8700 (tel.)
917-591-2875 (fax)
arozynski@eandblaw.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

---

| | |
|---|---|
| BRITNEY TRESCH, | |
| Plaintiff, | **Civil Action No.  21-375** |
| v. | |
| SSM HEALTH ST. CLARE HOSPITAL – FENTON, | **COMPLAINT** |
| Defendant. | |

---

Plaintiff Britney Tresch ("Plaintiff"), by and through her undersigned counsel, Eisenberg & Baum, LLP, as and for her Complaint against Defendant SSM Health St. Clare Hospital – Fenton ("Defendant" or "SSM"), hereby alleges the following based upon personal knowledge and information and belief:

**INTRODUCTION**

1. This case is equal access to information and health care services during one of the most important and vulnerable events a person can experience in their lifetime – childbirth. Plaintiff is deaf, and her primary language is American Sign Language ("ASL"). Plaintiff requires an ASL interpreter to effectively communicate and participate in a health care setting.

2. In January 2020, Plaintiff visited SSM to give birth to her daughter, "E.T.". During

1

her stay, hospital staff repeatedly refused to provide Plaintiff with an in-person interpreter for crucial pre- and post-delivery services, despite Plaintiff's repeated requests and Defendant's assurances that full-time interpretive services would be provided.

3.  Given Defendant's refusal to provide full-time interpretive services during Plaintiff's stay, Plaintiff was not able to effectively communicate during most of her stay at SSM.

4.  SSM otherwise offered Plaintiff video remote interpreting ("VRI") equipment that often either malfunctions or fails to display an interpreter, and in any event would not have been a viable means of communication between Plaintiff and SSM staff while Plaintiff was in labor or dealing with her newborn baby's post-partum health issues. VRI is "an interpreting service that [should] use[] video conference technology over dedicated lines or wireless technology offering high-speed, wide-bandwidth video connection that delivers high-quality video images." 28 C.F.R. § 36.104.

5.  SSM staff and doctors would also attempt to inform Plaintiff of updates on her and her baby's health through note-writing and by using her family members to interpret for her against her wishes.

6.  As such, Defendant failed to accommodate Plaintiff's disability during her six-day experience giving birth to her daughter at SSM.

7.  Language is the cornerstone of the patient-physician relationship. Indeed, "it is primarily through language that the physician works to establish rapport and trust. Good physician-patient communication is fundamental to good health care." E. McEwen & H. Anton-Culver, Journal of Family Practice, Vol. 26, No. 3:289–291, 291 (1988), https://bit.ly/2Fn3zLW.

8.  For a hearing patient, effective communication provides better patient safety, better treatment adherence, and better health care outcomes.

9. But without equally effective communication, Plaintiff could not make informed health care choices, particularly with regard to her daughter's birth and resulting health issues. Thus, SSM discriminated against her by refusing to provide the ASL interpreters that she required to understand and participate in the birth of her child.

10. SSM staff knew that Plaintiff was deaf at all relevant times.

11. Based on Plaintiff's experience, it is evident that SSM has failed to implement proper policies, procedures, and practices respecting the civil rights and communication needs of deaf individuals who primarily communicate in ASL. Plaintiff brings this lawsuit to compel SSM to cease its unlawful discriminatory practices and implement policies and procedures that will ensure effective communication, full and equal enjoyment, and a meaningful opportunity for deaf individuals to participate in and benefit from SSM's health care services.

12. Plaintiff brings this action seeking non-economic nominal and compensatory damages, injunctive and declaratory relief, and attorneys' fees and costs to redress Defendant's unlawful discrimination against her on the basis of her disability in violation of Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116.

**THE PARTIES**

13. Plaintiff is a resident of High Ridge, Missouri, who is substantially limited in the major life activities of hearing and speaking. Thus, she is a qualified individual with a "disability" within the meaning of federal civil rights laws.

14. Defendant SSM Health St. Clare Hospital – Fenton has at all relevant times been a non-profit corporation organized and operating within the State of Missouri and maintaining its offices and principal place of business at 1015 Bowles Avenue, Fenton, Missouri, 63026. SSM is a place of public accommodation.

15. Upon information and belief, SSM is a recipient of and accepts federal financial assistance, including but not limited to Medicare and/or Medicaid reimbursements.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the laws of the United States.

17. Venue is proper in this District under 28 U.S.C. § 1391(b) because SSM resides in this District and the acts and omissions giving rise to this Complaint occurred in this District.

## STATEMENT OF FACTS

**Background**

18. Plaintiff Britney Tresch is a profoundly deaf individual who communicates primarily in ASL. English is a secondary language for her.

19. Plaintiff cannot effectively communicate by reading a person's lips or exchanging written notes in English for all communications, especially those involving medical terminology, and particularly so in the context of childbirth.

20. Plaintiff's pregnancy was complicated, and her unborn child faced increased risks of health issues. Plaintiff suffered from gestational diabetes due to her pregnancy and was taking insulin shots four times per day. Plaintiff also suffers from depression, for which Plaintiff began taking Zoloft in November 2019.

21. On December 30, 2019, Plaintiff visited the ER at SSM on the recommendation of her obstetrician after expressing concerns regarding the imminent birth of her daughter, E.T.. There, she was sent to the Labor & Delivery unit at SSM, where she was provided with malfunctioning VRI for communication with SSM staff.

22. Because of Plaintiff's high-risk pregnancy and SSM's history of malfunctioning

VRI, Plaintiff notified SSM staff of her request to have a full-time in-person interpreter for her stay.

23. SSM staff informed Plaintiff that they would only provide in-person interpretive services for the first four hours of Plaintiff's labor per hospital policy, and that Plaintiff would have to use VRI services thereafter.

24. Accordingly, Plaintiff visited SSM again on January 7, 2020, with paperwork describing Plaintiff's high-risk pregnancy and potential complications, and explaining that VRI services would not be appropriate to use during Plaintiff's stay because of her high risk pregnancy and the history of malfunctioning VRI she experienced.

25. SSM staff assured Plaintiff that she would be provided full-time in-person interpretive services throughout her stay as requested, and not VRI.

26. Despite Defendant's assurances, Plaintiff would later discover that it was SSM's policy to only provide a _maximum_ of four hours of interpretive services per day to deaf individuals, and that SSM would only request such services last-minute. Because of this policy, Plaintiff was without any means to effectively communicate with staff and doctors for most of each day of Plaintiff's stay at SSM.

27. As such, most of Plaintiff's communications with SSM staff and doctors described below took place through a combination of note-writing and using Plaintiff's family members to interpret against Plaintiff's wishes.

**January 14, 2020**

28. On January 14, 2020, Plaintiff had a regularly-scheduled appointment with her high-risk pregnancy specialist and expressed concerns about the lack of movement from her unborn baby. The specialist contacted Plaintiff's obstetrician, who scheduled Plaintiff for delivery

5

at SSM at 2:30pm that same day.

**January 15, 2020**

29.     Around 5:30pm on January 15, 2020, Plaintiff's nurse notified Plaintiff that VRI, and not interpretive services, would be used for the remainder of Plaintiff's stay. Plaintiff repeated her request for a full-time in-person interpreter while she was in labor, as SSM had assured her would be provided. Plaintiff had been in labor for over eighteen hours at this point.

**January 16, 2020**

30.     Around 12:00am on January 16, 2020, Plaintiff underwent an emergency cesarean section procedure to deliver her baby, as the baby's heart rate had dropped and her head had become stuck.

31.     Immediately after her birth, E.T. was measured to have low blood sugar levels due to Plaintiff's diabetes. Plaintiff was anxious about the baby's health, was nauseous and vomiting, and had not taken her depression medication for two days.

32.     Around 8:00am, despite the complications with E.T.'s birth, SSM informed Plaintiff that they were ceasing interpretive services just thirty minutes later at 8:30am, and that SSM would have VRI services on standby in the hallway.

33.     A staff member at TLC Interpreting Services, Torri Ryder, who had provided the limited interpretive services on the morning of January 16, later noted in a summary of her encounter with Plaintiff that Plaintiff "uses pse [Pidgin Sign English] and lip reading," "[u]ses voice but is often misunderstood," "asked numerous workers to verify establishment of interpreting services 24/7," and that the "Hospital is trying to force the use of vri."

34.     Ms. Ryder also noted that the "house supervisor," Angie, "was extremely indignant and spoke in a demeaning tone to [Plaintiff] while they were requesting their needs," that Plaintiff

6

"explained numerous times that vri was not an option but Angie insisted that was one of the choices," and that "[a]nother nurse even stated the VRI was not working well."

35. Ms. Ryder later called Plaintiff and stated that she was troubled by the circumstances she had to leave in, and that she planned to reach out to the Missouri Commission for the Deaf and Hard of Hearing to let them know that Plaintiff's rights were being violated.

36. Around 10:00am, SSM informed Plaintiff that her newborn baby might be admitted into the Neonatal Intensive Care Unit (NICU) for issues relating to the baby's low blood sugar. Plaintiff did not have an interpreter for this encounter.

37. Around 10:30am, SSM informed Plaintiff that they would not be providing her with in-person interpretive services for the remainder of the day, despite that Plaintiff's baby was experiencing serious health issues. Plaintiff did not have an interpreter for this encounter.

38. Around 7:00pm, Plaintiff met with her obstetrician. Plaintiff did not have an interpreter for this encounter.

39. Approximately every two hours beginning at 4:00pm, SSM staff would check E.T.'s sugar levels and attempt to update Plaintiff through note-writing, and without an interpreter. For example, around 10:00pm, a nurse came to update Plaintiff on the status of her newborn baby, but no interpreter was present for this encounter.

**January 17, 2020**

40. Around 11:30am, Plaintiff met with a pediatrician regarding E.T.'s health issues, who expressed concern with having to wait to treat Plaintiff due to SSM's policy of only providing interpretive services for a maximum of four hours per day. This policy, along with the delay due to her need for interpreter services, caused Plaintiff to be treated differently than non-disabled patients, as hearing patients are not limited to 4 hours per day of communication with medical

7

providers.

**January 18 through January 20, 2020**

41. Around 5:00am, SSM staff communicated with Plaintiff through note-writing that SSM staff had trouble measuring E.T.'s blood sugar levels and had to take her to the specialized nursery. Plaintiff did not have an interpreter for this encounter.

42. For just four hours in the morning of January 18, Plaintiff was provided with an in-person interpreter. However, the interpreter abruptly left during Plaintiff's lactation consultation because SSM refused to provide in-person interpretive services for more than four hours per day.

43. Around 9:30pm, four days after Plaintiff was admitted to SSM, a pediatrician attempted to communicate an update on the status of Plaintiff's baby through VRI. Plaintiff did not have an interpreter for this encounter.

44. That evening, SSM notified Plaintiff that E.T. would be taken to another unit due to her high levels of jaundice.

45. On January 19, Plaintiff was only provided with four hours of interpretive services. Plaintiff was left without a means to effectively communicate with SSM staff regarding her and E.T.'s health for the other twenty hours of the day.

46. At 9:00am, however, before the four-hour block began, Plaintiff met with a pediatrician who noted that E.T.'s jaundice levels were not improving. Plaintiff did not have an interpreter for this encounter.

47. Just before midnight, Plaintiff met with the pediatrician again, who noted that E.T.'s jaundice levels were finally improving. Plaintiff did not have an interpreter for this encounter.

48. Plaintiff and E.T. were released from SSM on January 20, 2020.

49.     Despite Plaintiff's repeated requests for full-time ASL interpreter during her and her daughter's six-day hospitalization, and Defendant's assurances that such services would be provided, Defendants only provided Plaintiff with in-person interpretive services when its last-minute requests for an interpreter could be met, and never for more than four hours at a time per the hospital's policy.

50.     In most instances, effective communication could not have taken place between Plaintiff and SSM staff without the aid of an in-person, qualified ASL interpreter.

51.     Indeed, as a result of Defendant's failure to provide effective auxiliary aids and services, Plaintiff was not able to fully understand (1) SSM staff during the birth of her daughter; (2) the extent and circumstances of her newborn daughter's health problems; (3) the purposes of the treatments provided to her and her daughter; the common risks and/or benefits of those treatments; the common risks, side effects, and benefits of medications given; the specific dosage instructions for medications given; the existence of any alternative treatments; the approximate length of care; the potential side effects of stopping treatment the details of any aftercare or discharge instructions; etc.

52.     Defendant's discrimination against Plaintiff, and Plaintiff's resulting lack of understanding as to her and her child's medical care, caused Plaintiff to suffer humiliation, anger, frustration, stress, anxiety, and emotional distress.

53.     Defendant and Defendant's staff knew that Plaintiff is deaf and were aware that Plaintiff made repeated requests for full-time in-person interpreters. This is especially true because Defendant assured Plaintiff, based upon her medical history, paperwork, and high-risk pregnancy, that she would be provided with full-time in-person interpretive services.

54.     Defendant also knew or should have known of its obligation as a health care

provider under the ACA to develop policies and promote compliance with these statutes and to provide reasonable accommodations, including but not limited to the provision of in-person ASL interpreters to ensure effective communication with deaf persons.

55. Defendant and its staff knew or should have known that their actions and/or inactions created an unreasonable risk of causing Plaintiff greater levels of fear, anxiety, indignity, humiliation, and/or emotional distress than a hearing person would be expected to experience.

56. Nonetheless, Defendant prevented Plaintiff from benefitting from its services by failing to provide the ASL interpreters necessary for her full participation in and understanding of her care and of her child's care.

57. In doing so, Defendant intentionally discriminated against Plaintiff and acted with deliberate indifference to her federally protected rights.

58. Defendant's wrongful and intentional discrimination against Plaintiff on the basis of her disability is reflected by Defendant's failure to train employees and promulgate policies of non-discrimination against deaf individuals.

59. Defendant's wrongful and intentional discrimination against Plaintiff on the basis of her disability is reflected by Defendant's policy of only providing deaf individuals with a maximum of four hours of interpretive services per day of treatment.

60. As a result of Defendant's failure to ensure effective communication with Plaintiff, Plaintiff received services that were objectively substandard and that were inferior to those provided to patients and companions who are hearing.

61. Plaintiff is entitled to equal access to services offered by Defendant as are enjoyed by non-disabled persons.

62. Plaintiff still wishes to access SSM's services and receive care in Defendant's

facilities, but it deterred from doing so by Defendant's discrimination against her on the basis of her disability.

## CAUSES OF ACTION

**COUNT I: Violations of Section 1557 of the Patient Protection and Affordable Care Act**

63. Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

64. At all times relevant to this action, the ACA has been in full force and effect and has applied to Defendant's conduct.

65. At all times relevant to this action, Plaintiff has had substantial limitations to the major life activities of hearing and speaking and has been an individual with a disability within the meaning of the ACA, 42 U.S.C. § 18116.

66. At all times relevant to this action, Plaintiff's primary language for communication has been ASL, and she "has a limited ability to read, write, speak, or understand English." 45 C.F.R. § 92.4. Plaintiff is thus an individual with limited English proficiency within the meaning of the ACA.

67. At all times relevant to this action, Defendant received federal financial assistance, including Medicare and Medicaid reimbursements, and has been principally engaged in the business of providing health care. Thus, Defendant is a health program or activity receiving federal financial assistance under 42 U.S.C. § 18116(a).

68. Under the ACA, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116.

69. Federal regulations implementing the ACA provide that (1) a "covered entity shall offer a qualified interpreter to an individual with limited English proficiency when oral interpretation is a reasonable step to provide meaningful access for that individual with limited English proficiency" and (2) a "covered entity shall use a qualified translator when translating written content in paper or electronic form." 45 C.F.R. § 92.201(d)(1)–(2).

70. Federal regulations implementing the ACA provide that a covered entity that provides a qualified interpreter "through video remote interpreting services in the covered entity's health programs and activities shall provide" (1) "[r]eal-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication," (2) a "sharply delineated image that is large enough to display the interpreter's face and the participating individual's face regardless of the individual's body position," (3) a "clear, audible transmission of voices," and (4) "[a]dequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the video remote interpreting." 45 C.F.R. § 92.201(f)(1)–(4).

71. Federal regulations implementing the ACA provide that a "[covered] entity shall furnish appropriate auxiliary aids and services when necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a [covered] entity. . . . In determining what types of auxiliary aids and services are necessary, a [covered] entity shall give primary consideration to the requests of individuals with disabilities.  In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

28 C.F.R. § 35.160(b), *cited by* 45 C.F.R. § 92.202(a).

72. As set forth above, Defendant discriminated against Plaintiff on the basis of her disability in violation of the ACA and its implementing regulations.

73. The ACA, by incorporating the enforcement mechanism of the RA, extends a cause of action to Plaintiff–that is, "any person aggrieved" by discrimination in violation of the Rehabilitation Act. 42 U.S.C. § 18116(a).

74. Defendant has failed to implement policies, procedures, and training of staff necessary to ensure compliance with the ACA.

75. Plaintiff is entitled to injunctive relief, attorneys' fees, costs, and disbursements, nominal damages, and compensatory damages for the injuries and loss she sustained as a result of Defendant's discriminatory conduct and deliberate indifference as alleged under 42 U.S.C. § 18116(a).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Britney Tresch respectfully requests that this Court:

A. Enter a declaratory judgment under Rule 57 of the Federal Rules of Civil Procedure, stating that Defendant's policies, procedures, and practices have subjected Plaintiff to unlawful discrimination in violation of Section 1557 of the Patient Protection and Affordable Care Act;

B. Issue an injunction forbidding Defendant from implementing or enforcing any policy, procedure, or practice that denies deaf or hard of hearing individuals or their companions meaningful access to, and full and equal enjoyment of, Defendant's facilities, services, or programs;

C. Issue an injunction ordering Defendant to:

      i.    develop, implement, promulgate, and comply with a policy requiring that when a deaf or hard of hearing individual requests an in-person interpreter for effective communication, when other means are not effective one will be provided as soon as practicable in all services offered by Defendant;

      ii.    develop, implement, promulgate, and comply with a policy to ensure that Defendant will notify individuals who are deaf and hard of hearing of their right to effective communication; including posting explicit and clearly marked and worded notices that Defendant will provide sign language interpreters upon request to ensure effective communication with deaf or hard of hearing persons;

      iii.    develop, implement, promulgate, and comply with a policy to ensure that deaf or hard of hearing individuals are able to communicate through the most appropriate method under the circumstances, recognizing that the Video Remote Interpreting system is not appropriate in all medical situations;

      iv.    create and maintain a list of sign language interpreters and ensure availability of such interpreters at any time of day or night;

      v.    train all employees, staff, and other agents on a regular basis about the rights of individuals who are deaf or hard of hearing under the ACA;

D. Award to Plaintiff:

      i.    Compensatory damages under the ACA;

      ii.    Reasonable costs and attorneys' fees under the ACA;

      iii.    Nominal Damages;

      iv.    Interest on all amounts at the highest rates and from the earliest dates allowed by law; and

  v. Any and all other relief that this Court deems just and appropriate.

Dated: March 29, 2021        Respectfully submitted,

                 EISENBERG & BAUM, LLP

                By:_____
                Andrew Rozynski, Esq.
                24 Union Square East, Penthouse
                New York, NY 10003
                (212) 353-8700
                ARozynski@eandblaw.com
                *Attorneys for Plaintiff*